This is 4-13-0799. People of the State of Illinois v. Stanley Dye. Attorney Wilson is here on behalf of the appellant. Attorney Brooks is here on behalf of the appellee. Mr. Wilson, are you ready to proceed? Alright, you may do so. May it please the Court. Counsel. Good afternoon, Your Honors. My name is Ryan Wilson, and I represent Stanley Dye on behalf of the Office of the State Appellate Defender. Lawyers and clients sometimes disagree about how to handle a criminal case. Here, Stanley Dye was frustrated with his attorney, and I think it's fair to say his attorney was frustrated with him as well. What began as a polite discussion of an ongoing criminal case dissolved into an argument when Mr. Dye's attorney told Mr. Dye that she believed he hadn't been truthful with her. And as a result, she had found evidence that was not helpful to his case and had disclosed that evidence to the State as she was required to do. This made Mr. Dye feel like she wasn't fighting for him, that she was advocating more for the State. And he told her that. Mr. Dye was a very passionate person. Ms. Lacey, his attorney, knew that from previous experiences with Mr. Dye. And he was loud when he was expressing his frustration with what his attorney had done. But rather than try and calm the situation, his attorney intentionally spoke over him, trying to be louder than Mr. Dye, and their argument continued. It continued to the point that Ms. Lacey ordered Mr. Dye to get up from his chair, spit out his toothpick, and leave her office. She stood in her office doorway as he walked past her and towards the exit of the public defender office. And Mr. Dye was still frustrated. On his way towards the exit, he said several things, such as Ms. Lacey was trying to put him away, that she was in league with the State, that she wasn't working for him, that she was working with the State against him, that she was trying to sell him out. And finally he said, I'm going to get you. Ms. Lacey heard this statement and said, are you threatening me? And according to Mr. Dye, he put his hands up kind of in a pleading manner and said, no, I'm not threatening you, but Ms. Lacey never heard that. Possibly because he was in the secured area of the public defender. Did anybody hear him say that? Andrew Bauer, who was an office employee, heard Mr. Dye say something. He wasn't exactly sure what it was, though. Mr. Dye is the only one that testified as to the explicit nature of what he said once Ms. Lacey asked him if she was being threatened. Lacey perceived this final statement as a threat, and as a result, Mr. Dye was charged with threatening a public official, and ultimately he was convicted after a bench trial. But as stated in the brief, there were several problems with this conviction. Some of those problems even were noted by the very judge who presided over the bench trial at the time that he convicted Mr. Dye. The court noted its belief that Mr. Dye's statement wasn't a proper threat, and that it was possibly being made not because of Ms. Lacey's role as a public official, but because of her role as Mr. Dye's attorney. And the court was right to have these concerns. Generally, whenever a defendant is prosecuted for threatening a public official, the statement that underlies that charge is an explicit threat. In Kirkpatrick, for example, the defendant contacted a judge and said, unless you kill another judge, I'm going to kill you. And when he was questioned about that statement by an investigator, he said, yeah, I was serious about that. In Skates, a case that this court examined and decided, albeit on completely different grounds than what are being argued here, the defendant wrote an assistant attorney general and said, I'm going to kill you ASAP. Those are the sorts of threats that threatening a public official statute was implemented to prohibit. The Illinois Supreme Court, when it looked at the word threat in the intimidation statute, said that a threat should have a reasonable tendency to create apprehension that its originator will act according to its tenor. That's not what we have here. Mr. Dye's statement was vague. It could have meant many different things. His statement could have meant that he was going to file a complaint with the Attorney Registration and Disciplinary Commission. It could have meant that he was going to try and have Ms. Lacey's law license revoked, or that he was going to complain to the presiding judge regarding her conduct. It could have meant many, many different things. This isn't a case like the People v. Williams case that's cited in the briefs, where the defendant called 911 and told the dispatcher that he had a bullet for Mayor Daley and that he had a specific date and time that Daley was going to be shot. That is the type of threat that the statute was implemented to protect against, not these general statements where no one knows exactly what Mr. Dye meant, and the state can't prove what he meant. In People v. Barkley, a federal case that is cited in the briefs as well, the court looked at a letter that was sent from a client to his attorney. The client was upset with the attorney, and the client wrote to the attorney and said, once I get my case in a certain posture, you're going to be the first SOB to go. And the defendant was convicted of transmitting a threat. The reviewing court looked at that and said, no, this isn't a threat. This is the sort of thing that an attorney should count on receiving from a disgruntled client. This isn't the sort of threat that the statute was implemented to protect against. And all of these sentiments were stated not just by me, but by the judge that ultimately convicted Dye. The judge said, in my opinion, it's overly broad. I can think of a number of instances where I've had people say they're going to get me, and it's not a specific threat. They're just really irritated at me for one reason or another. But the general statement, I'm going to get you in the heat of the argument, I seriously question whether that's what the legislature intended. The judge seemed very confused about the proper standards that apply to this case and whether Dye should be convicted. On several occasions, the court went so far as to say that he hopes that a reviewing court that examines this case will provide guidance on when a threat is specific enough and when a threat is properly directed at a public official. In my estimation, anyway, I think the court had thought that it could either acquit Dye and not have this issue decided or convict him and allow this court to decide whether that conviction should stand or not. The court felt so passionately about the absence of state's evidence against Dye that once it convicted Dye and once it sentenced him, it granted him sui sponte, an appeal bond. An appeal bond that Mr. Dye is still currently out and serving. So the court didn't feel strongly about the conviction in this case and asked essentially this court for guidance on whether the conviction should stand. In addition to the fact that this was a very general statement, questions also remain regarding whether this was a statement that was directed at Jacqueline Lacy as a public official in her office as the Vermilion County public defender. Again, the court expressed some concern about the state's evidence on this point. The court said there's a real legal question, which I'm sure is going to be addressed by a court of review, as to whether when a public official is serving as counsel for a defendant, if the argument is directly related to their relationship as an attorney and client, whether in fact that constitutes the type of public duty that was intended by the legislature. And what the court is referencing there is the requirement that the state prove that the threat has to be related to an official's public status. That is not what we have in this case. What we have in this case is a defendant who is upset at his attorney's representation of himself in court. He's upset at the procedural maneuvers that his attorney is taking. He's upset that his attorney has just turned evidence that's going to hurt his criminal case over to the state. And he's expressing that dissatisfaction as he's walking from the public defender's office to the rest of the main courthouse. When he's saying things such as Lacey was trying to put him away or was in league with the state or was working not for him but with the state or trying to sell him out, these aren't things that have anything to do with their status as a public official or things that have anything to do with their status as the Vermillion County public defender. These are things that he is communicating his frustration about her representation of him in his case. This is the type of argument that probably takes place daily or weekly throughout offices in Illinois when attorneys and their clients get together. As I said during my opening remarks, attorneys and clients sometimes disagree with the way to handle cases. Dye was simply expressing his frustration at what his attorney had done here. There's a Pennsylvania case that's cited in the briefs as well, the Reese v. Danforth case. And I do understand that it's a Pennsylvania case, but I think it still is, it kind of encapsulates the argument that we're making here today. The court in that case held that once the appointment of a public defender in a given case is made, his public or state function ceases and thereafter he functions purely as a private attorney concerned with serving his client. Now granted, because Ms. Lacey was appointed to represent Dye, that doesn't mean that she's no longer the Vermillion County public defender. But there is a sense of loyalty there, that once she is appointed to represent Dye, she becomes his advocate. There's a fiduciary relationship there. And for a lack of a better way to put it, she's essentially wearing two hats. She is a public official, but she's also acting as Dye's attorney. Dye can criticize her actions as his attorney without criticizing her as a public official. And that's exactly what he was doing in the instant case. In short, the statements that Dye made in this case were not made because of her public duty. It was made because he was frustrated with her. He was voicing his concern with what she had done in his case. And it's worth noting that whenever you're looking at threatening a public official case, the precedent says you must look at the context in which a statement was made. Clearly, Dye was upset here. He was saying many things. He and his attorney had just been in an argument. This wasn't a one-sided thing. Both of them had raised their voices. It had gotten the attention of the other employees of the public defender's office. In this context, his statement, his vague and general statement, I'm going to get you, doesn't convey anything else other than his dissatisfaction with her representation. Now, as I said, those were concerns that even the circuit court noted when a convicted Dye. There's yet another concern in this case that the court didn't even touch on. And to some extent, it shadows the arguments I've already mentioned. And that is the idea that the threatening a public official statute deals with First Amendment. And the state cannot prescribe lawful First Amendment conduct or statements. As a result, if you go back and you look at all the cases that have dealt with threatening a public official, as I said, they all make fairly specific, detailed threats. They do that because there's an exception to the First Amendment right that we all have. And that is when it comes to a public or to a true threat. A true threat is a threat that encompasses statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual. The way that the threatening a public official statute and the First Amendment can coexist is because all of the offenses, all of the statements that lay at the foundation of the threatening a public official charges and convictions are true threats. If someone makes a threat that isn't a true threat, and they're prosecuted under the threatening a public official statute, there's a very real First Amendment argument that the threatening a public official statute doesn't pass constitutional muster as applied. Here, whether it's because the threat was too general to constitute a threat under the threatening a public official statute or because it didn't constitute a true threat, Stanley Guy's conviction must be reversed. And for those reasons, I would ask this court to do that very thing. Are there no further questions? Thank you, Mr. Wilson. Thank you. If you don't have more time, I'm going to rebuttal. Ms. Brooks? Good afternoon, Your Honors. May it please the Court and the Council, I'm Allison Paige Brooks on behalf of the people. The different elements are being contested. The first element is that the communication is placing the official in reasonable apprehension of future bodily harm. And so the defendant is contesting the reasonableness of Lacey's apprehension of future bodily harm from his statement that he was going to, quote, get her. And he said it multiple times, and he was also pointing his finger down at the same time. So it also has to do with the context, the tone and loudness of his voice, the anger. All that in combination can be considered with respect to whether Lacey, who actually did fear the defendant because of this statement, whether that fear of future bodily harm was, in fact, reasonable. And because of the combination of all those things, the context is not like a sporting event or something which would make the word a lot more innocuous. As the defendant admits, he was in her office, he was mad at her, he was perceiving that she was being disloyal to him. And in those respects, the defendant's word takes on the dictionary meaning of get meaning to take vengeance on and specifically meaning to kill. And that is something that can be reasonably construed from that word. And so the Roy case from the Ninth Circuit Court of Appeals in 1969 dealing with threats against the President of the United States, the words used there in which the conviction was upheld in federal court was, and I quote here, I am going to get him. And that is just as vague and general as the defendant's statements in this case, but were sufficient to uphold a conviction for an awful threat against the President of the United States in that case. And so that is precedent for showing that the statute does not require specific threats to be made with the exception of the subsection that deals with, for example, peace officers. There is a specific provision in the statute that requires a threat to be specific. But however, in this case, that requirement of specificity does not apply. So therefore, even though the threat is subtle, it is still nonetheless a prohibited threat under the Threatening Public Official Statute. And the claim that the defendant made the statement that he actually denied in response, that he was threatening Lacy in response to Lacy's question, that is not something that has to be accepted by the Charter of Facts. He simply defended his own testimony to that point, and therefore the judge can disbelieve that, does not have to accept the credibility of the statement. And the defendant's response that somehow his statement was so vague that she had to ask, Lacy had to ask, whether he was threatening her or not, the defendant's quotation omits the word, I will not use the profanity, but the F word that proceeded inside that when she asked if he was threatening her. Essentially the way she said it was, she could not believe that her own client in her own office was going to threaten her with future bodily harm right in front of her. So essentially it's a statement of astonishment and a shock, and that's something that can be reasonably construed. And because in the context of this review, a sufficiency of the evidence, this court has to accept the people's evidence in a light most favorable to the people. So if that's reasonable to infer that that's what she meant by asking him if he was threatening her, using that profanity word, that that is the construction that has to be drawn on appeal. As I said, the combination of the conduct, the finger pointing down, not just what he said, adds to the meaning. So with respect to the judge's request for guidance, it seemed the judge was kind of troubled by what the judge perceived to be the actual state of the law. And I know there was some legislative history on this point, but essentially a judge's personal views are not going to let the judge decide the case a particular way. So if the judge disagreed with the state of the law, the judge is still bound to apply the law as it is written. And as it is written, as the judge correctly recognized, even a general threat such as the one in this case would qualify as a prohibited threat. And so this court can certainly give the judge and other judges guidance on that point and answer that question in the affirmative and say that even general threats for these type of public officials do qualify. The judge also had a question as to whether this was kind of a closer question, whether the public official was acting as a public official at the time, or essentially whether this threat was related to the non-performance or performance of some public duty, is what was alleged in the charge. The Pennsylvania case is not persuasive. That's decided in the defendant's brief. Instead, the United States Supreme Court case of Hurtado recognizes that this is a public... representation of an indigent defendant is... representation of indigents by a court-appointed attorney is considered a performance of a public duty. And that was citing the United States v. Dillon case, 9th Circuit, 1965, as being a situation where the government doesn't have to pay for the performance of a public duty as already owed. That's essentially the question that was at issue there. And because representing a court-appointed attorney representing indigent defendants is a public duty, an attorney who joins the bar can be appointed to represent somebody who can't afford an attorney. And if that attorney cannot be paid for some reason, well, that's too bad, because a lawyer is an officer of the court obligated to represent defendants for little or no compensation upon court order. Essentially, that's what happens when someone is appointed to be a court-appointed attorney. They are still performing a public duty. Yes, they do have private duties that they owe to the defendant because they are serving as that defendant's lawyer. But that does not somehow destroy the nature of the public duty upon appointment. So the fact is, even if they have simultaneous private duties flowing to the client, they're still performing a public duty. And also the defendant's arguments amidst the fact that one of his biggest gripes was the fact that Lacey, who is the actual public defender at the time, was refusing to appoint him a different lawyer. And Lacey had described the process, or her office's policy. She would not assign, she chooses the assignments as her responsibility as the public defender. And she's not going to change that once it's made. So the defendant did not like that. So he is angry at her for the non-performance of her public duty as the county public defender to make assignments of cases to the various, either to herself or other public defenders under her supervision. So even if it's not just limited to the fact that he was representing the defendant and subpoenaed evidence that turned out to be incriminating, it's more than that. Because she's also the county public defender, still at the same time responsible for assignments. With respect to the First Amendment, this court cannot reach that issue unless this court also finds first that the evidence was sufficient to convict because of the constitutional abstention doctrine. So assuming this court finds the evidence sufficient to convict, this court should apply the rule from the majority of circuit courts of appeals who have addressed the question of whether subjective intent to threaten is required. And the reason why this dispute arose is because of language in the Virginia v. Black case in which the U.S. Supreme Court said that true threats encompass the statements of intent to commit an act of unlawful violence. And because they used the word encompass, the majority of the courts have the better argument on this. It's more persuasive. A compass just simply means that what followed was not an exhaustive list of all of the possible threats. In Virginia v. Black, that simple few lines and short paragraph was not an intent by the U.S. Supreme Court to somehow redefine what a true threat means and limit it only to statements of subjective intent to commit an act of unlawful violence. The Diomedes case from the Illinois Public Court shows, and this was not a threatening public official case, but I think it was disorderly conduct, that the same analysis can apply because of Section 4-3 of the Criminal Code, which says the mental state is interpreted to apply to all, according to Diomedes, under Section 4-3, a mental state of knowledge is interpreted to apply to all subsequent elements of the crime, because it's stated at the beginning and not later on in the statute. So the statute says, knowingly delivers or conveys to a public official a communication containing a threat that would place the public official in reasonable apprehension of future bodily harm. What this means is the defendant must know that his communication is a threat and it would place the public official in reasonable apprehension of future bodily harm. And because of his knowledge of that fact, it is in fact a true threat. So this statute is in fact constitutional, and constitutional is applied in this case, because when he said, I am going to get you, knowing that Lacey would reasonably apprehend that as a threat placed to her in apprehension of future bodily harm, that takes it as out of the scope of the protective speech under the First Amendment. It is in fact a true threat. And because knowledge is required, there is a culpable mental state requirement to the statute. So for those reasons, the trial court was entitled to infer what defendant's knowledge was at the time he made this threat to Lacey. So that's the extent of the state's prepared arguments. I'm willing to answer any questions. Otherwise, I request this Court to affirm. Thank you. Thank you, counsel. Mr. Wilson, any rebuttal? Yes. Thank you. The statute requires that the apprehension of harm be reasonable. And again, it's where this case comes back to the context of what's just happened. Dye and his attorney have just had an argument. Dye is upset. The state in its brief has, and during argument, has alluded to the fact that Lacey wouldn't appoint Dye another public defender. However, Dye never says that he was upset, and his comment that I'm going to get you had anything to do with that. In fact, read in its context, the statements that he made as he was exiting the public defender suite of offices seems to show that what he was upset about was the fact that his attorney had just given this evidence to the state. It makes perfect sense when you look at the statements like Lacey was trying to put him away. She was in league with the state. You're not working for me. You're working with the state against me. Those are comments that somebody would make when they've just been told that their attorney has given damaging evidence to the state, evidence that could very well lead to their conviction. Dye never states that he was upset or the words that he used were a result of his belief that Lacey was a public official and was in her capacity as a public official denying him a right to another attorney. In fact, Lacey told Dye, we've got a court hearing the next day. You can tell the judge that you want a new attorney then. Dye showed up for that court hearing. It was as though he didn't believe that he'd ever threatened Lacey, which I don't think that's an unreasonable belief. His statement really wasn't threatening given the context of what's just happened between him and Lacey. The state talks about this Roy case that dealt with the threat against the president of the United States. The important thing to remember about this case is Dye and Lacey had a relationship. The defendant and Roy, I would guess, didn't personally know the president of the United States when he was making that threat. Dye was making his statement because of this relationship, this fiduciary relationship that he had with Lacey, and there was something about that relationship he didn't agree with. What he said was just a mere expression of his frustration. It wasn't something like the Williams case where the defendant threatened to shoot Daly at a certain time on a certain date. He arguably didn't know Daly, so it had to be inferred that his threat against Daly was due to something that Daly had done in his official capacity. We don't have that here. The evidence fairly clearly shows that Dye was upset with the decision that his attorney had made in his case. Regardless of who his attorney was, if it was a public official or if it was the chief public defender of the county, Lacey did have private duties to Dye. She had ethical duties to Dye, and that's what they were discussing in the context of their attorney-client relationship that started this whole argument in the first place. She had received this evidence. She had to turn it over to the state. Their discussion wasn't something about a policy of the Vermilion County Public Defender's Office or a policy that Lacey had implemented. It was regarding Dye's specific case, and that's what makes this case different from a lot of the cases that the state has cited, cases where there was no personal relationship between the defendant and the person who argued they were threatened. Dye's statement, again, was general. I'm going to get you. And there are many cases which examine factual situations on either side of that statement. The majority of the cases require there to be some sort of clear, detailed threat saying, I'm going to shoot you, or I know where you live, and I'm going to come after you and do something to you. The cases that fall below that standard are cases where a threat, a conviction based on a threat cannot be sustained, such as the Barkley case that I talked about earlier where he threatened to get his attorney, or his attorney would be the next one to go. Courts don't find that those sorts of statements have the necessary specificity to be a threat. And that's why, again, the threatening of public official statute can live in harmony with the First Amendment. If a conviction can be satisfied based on an individual saying, I'm going to get you, without any further context or explaining what that statement means, or further than that, explaining that that statement is a violent threat, a true threat, then the threatening of public official statute in this case runs afoul of the First Amendment. And either because the statement was too general, and because it was made outside of Lacey's role as a public official, or on First Amendment grounds, Dye's conviction must be reversed. Are there no further questions? Thank you, Mr. Wilson. We take this matter under advisement and stand at recess until the next case.